# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BONNIE HOFFMAN<br>3525 Chestnut Street<br>Camp Hill, PA 17011<br><br>       Plaintiff,<br>v.<br><br>THE MILTON S. HERSHEY MEDICAL CENTER<br>100 Crystal A Dr.<br>P.O. BOX CA522<br>Hershey, PA 17033<br>    and<br>PENN STATE HEALTH<br>100 Crystal A Dr.<br>P.O. BOX CA522<br>Hershey, PA 17033<br><br>       Defendants. | CIVIL ACTION<br><br>No.:<br><br>**JURY TRIAL DEMANDED** |

## CIVIL ACTION COMPLAINT

Plaintiff, Bonnie Hoffman (hereinafter referred to as "Plaintiff"), by and through her undersigned counsel, hereby avers as follows:

## INTRODUCTION

1. Plaintiff has initiated this action to redress violations by The Milton S. Hershey Medical Center and Penn State Health (hereinafter collectively referred to as "Defendants") of the Americans with Disabilities Act, as amended ("ADA" - 42 U.S.C. §§ 12101 *et. seq*.), and the Pennsylvania Human Relations Act ("PHRA").  As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

## JURISDICTION AND VENUE

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks redress for violations of federal laws. There lies supplemental jurisdiction over Plaintiff's state-law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3. This Court may properly maintain personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendants are deemed to reside where they are subjected to personal jurisdiction, rendering Defendants residents of the Middle District of Pennsylvania.

5. Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC"). Plaintiff has properly exhausted her administrative proceedings before initiating this action by timely filing and dual-filing her Charge with the EEOC and PHRC, and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.

6. Plaintiff has properly exhausted her administrative remedies regarding her PHRA claims by waiting at least one year since the filing before asserting her PHRA claims.

## **PARTIES**

7. The foregoing paragraphs are incorporated herein their entirety as if set forth in full.

8. Plaintiff is an adult who resides at the above-captioned address.

9. The Milton S. Hershey Medical Center (hereinafter individually referred to as "Defendant MHMC"), a member of the Penn Health system, is a 619-bed non-profit, tertiary, research, and academic medical center headquartered in Hershey, Pennsylvania, with an address as set forth in the above caption.

10. Penn State Health (hereinafter individually referred to as "Defendant PSH") is a multi-hospital health system serving patients and communities across Central Pennsylvania, with an address as set forth in the above caption.

11. The business names set forth above were used interchangeably on Plaintiff's employment documents and internal documents within Defendants during her employment with Defendants.

12. Because of their interrelation of operations, common ownership or management, centralized control of labor relations, common ownership or financial controls, and other factors Defendants are sufficiently interrelated and integrated in their activities, labor relations, ownership, and management, that they may be treated as a single and/or joint employer for purposes of the instant action.

13. At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

**FACTUAL BACKGROUND**

14. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

15. Plaintiff was employed by Defendants for approximately 11 months, from on or about January 2, 2023, until her unlawful termination/constructive termination (discussed further *infra*) on or about November 27, 2023.

16. Plaintiff was hired as a Medical Office Assistant, for Defendants' facility located at 3025 Market Street, Entrance A, Camp Hill, PA 17011.

17. During her employment with Defendants, Plaintiff was primarily supervised by Supervisor, Tina Tocco (hereinafter "Tocco").

18. Throughout her employment with Defendants, Plaintiff was a hard-working employee who performed her job very well.

19. Plaintiff has and continues to suffer from ADA-qualifying disabilities, such as lumbar spine conditions (and associated complications/conditions).

20. As a result of Plaintiff's aforesaid health conditions, she suffers from pain, stiffness, and mobility issues, which (at times) interfere with her ability to perform some daily life activities, such as bending, lifting, and working (among other daily life activities).

21. Despite Plaintiff's aforesaid health conditions and limitations, she was able to perform her job duties well; however, she (at times) required some reasonable medical accommodations (set forth *infra*).

22. For example, in or about May of 2023, Plaintiff's health conditions began to worsen, and her doctor recommended that she undergo surgery to her lumbar spine, with an 8-to-12-week recovery period thereafter (a reasonable accommodation under the ADA).

23. As a result, and because she had only recently begun working for Defendants, Plaintiff inquired of Tocco whether she could take time off to have her surgery, with an 8 to 12 week recovery period thereafter, and still keep her job – to which Tocco gave a resounding "no" – without any further discussion or engagement in the interactive process (as required under the ADA).

24. Plaintiff asked Tocco if there were any other accommodations or types of leave that Defendant could provide, but Tocco simply advised that Plaintiff did not qualify for leave pursuant to the Family and Medical Leave Act ("FMLA"), completely failing to consider or alert Plaintiff to her rights and Defendants' obligations under the ADA to accommodate Plaintiff.

25. Because she was fearful of losing her job (which she loved) and her medical insurance, and being unable to financially support herself, Plaintiff pushed off her surgery, despite that she was in near constant pain and discomfort for the next several months.

26. Thereafter, when she could no longer tolerate the pain and mobility issues of her spinal disabilities, Plaintiff scheduled her spine surgery for November 6, 2023.

27. Having been told by Tocca that she could not take medical leave to undergo surgery and recover from the same while maintaining her employment, Plaintiff, while crying, provided Tocca with her four-weeks' notice[1] and resignation on or about October 1, 2023.

28. Plaintiff's resignation letter demonstrated her heartbreak over having to leave a job she loved and that she had no other choice but to resign in order to undergo her medically necessary surgery, and stated in relevant part:

> *This has been one of the hardest decisions I have had to make. Going back and forth, torn over what to do; I would have preferred to find an alternative such as remote or part time….*

---

[1] Plaintiff to be courteous despite Defendants' failure to treat her the same way, provided four weeks' notice as Defendants' schedule is done four weeks in advance.

*It is with a heavy heart, Due to the unforeseen issues with my back and requiring surgery (that I should have had done months ago and I put it off because of this job) I unfortunately am in a position where I must submit my resignation. My last day will be November 3rd 2023.*

29.  While providing her notice and intent to resign to Tocca, on or about October 1, 2023, Plaintiff, in a last-ditch effort to retain her job with Defendants, asked Tocca what would happen if she changed her mind about the surgery during the four-week notice period – to which Tocca replied that Plaintiff had up until November 3, 2023, to change her mind.

30.  Tocca also informed Plaintiff that if she reapplied for her position within 6 months of her resignation, she would not have to undergo training again.

31.  On or about October 30, 2023, however, while finishing her four-week notice period, Plaintiff had a discussion with Defendants' Vice President, Human Resources ("HR"), Jennifer Sarff (hereinafter "Sarff") about her inability to obtain any kind of medical leave through Defendants that would allow her to retain her job.  Sarff advised Plaintiff to do everything that she could to try to work with Tocco and HR to retain her job position.

32.  Plaintiff thereafter reached out to Tocco again and then HR inquiring if there was any way she could keep her job and still get her back surgery, after which she was directed to HR Representative, Rebecca Myers (hereinafter "Myers"), who advised her to contact Defendants' third-party leave company, AbsenceOne.

33.  This was the first time that Plaintiff was ever advised by anyone at Defendant to contact AbsenceOne in order to apply for medical leave.

34.  Thereafter, on or about November 1, 2023, while on her lunchbreak, Plaintiff called AbsenceOne and was informed that she was tentatively approved for short term disability ("STD")/medical leave, pending whether they could confirm she had STD coverage with Defendants – which she did, and had been paying into since her hire.

35. Plaintiff then immediately informed Tocco that she had been tentatively approved for STD/medical leave that same day, to which Tocco replied that she had received an email confirming the same.

36. Plaintiff indicated her intent at that time to continue to work for Defendants and to return following her medical leave.

37. On or about November 3, 2023, while about to go out on STD/medical leave for her surgery, Tocco and Plaintiff discussed whether Defendants should "hold on to" Plaintiff's aforementioned resignation letter.

38. Considering that no one within Defendants had notified Plaintiff that her medical leave would have been (or should have been) protected under the ADA, even if AbsenceOne could not confirm that she had STD coverage with Defendants, Plaintiff made the misinformed decision to enter into a verbal agreement with Tocco on November 3, 2023, that Tocco would apply Plaintiff's resignation letter *only if* Plaintiff was not approved for STD/medical leave, so that it did not look like she had "just quit for no reason" or failed to provide proper notice.

39. Additionally, Plaintiff was led to believe by Tocco that if her STD/medical leave was approved by Defendants, she would not lose her job and could return following her medical leave. Plaintiff therefore reiterated her expressed intent to return to her job following her medical leave during her November 3, 2023 conversation with Tocco.

40. On or about November 14, 2023, following her surgery and while still out on medical leave, Plaintiff received a text that her STD/medical leave claim had been approved.

41. As a result, and based upon her prior conversation with Tocco, Plaintiff believed that her resignation letter was no longer valid and was effectively rescinded, as her medical leave had been approved, and she would therefore not lose her job.

42. Inexplicably, Plaintiff then received a letter from AbsenceOne dated November 21, 2023, stating that she was suddenly denied for the same leave period because "your leave was not approved for review by your manager and/or Penn State Health" – which made no sense given Plaintiff's aforementioned conversations with Tocco and HR.

43. Thereafter, on or about November 27, 2023, Plaintiff's doctor's office submitted paperwork to Defendants' third-party leave company, Sedgewick, and Plaintiff also informed Defendants that she would be likely be cleared to return to work on or about February 6, 2024.

44. Thus, Plaintiff only required a 12-week medical leave, 4 weeks of which would be covered by the FMLA when Plaintiff became eligible on or about January 2, 2024, and the remaining 8 weeks of which constituted a reasonable accommodation under the ADA.

45. Plaintiff then received a letter by mail from Defendants on or about November 27, 2023, informing her that her aforementioned medical leave had been denied (despite receiving confirmation that it had been approved on or about November 14, 2023).

46. When Plaintiff reached out to Sarff to contest the denial of her medical leave, Sarff advised her to contact Meyers.

47. Plaintiff then contacted Meyers, who informed her that she would send her concerns to Employee Relations Specialist, Janice Bullock (hereinafter "Bullock").

48. Bullock then called Plaintiff on or about November 28, 2023, and advised her that she would get back her by on or about November 29, 2023, or December 1, 2023, after she had a chance to speak to Defendants' management.

49. Thereafter, on or about December 1, 2023, Bullock advised Plaintiff that her leave had been denied because she had resigned from her position.

50. When Plaintiff protested that she had rescinded her resignation (pursuant to her prior conversation with Tocco on November 3, 2023 – discussed *supra*), Defendants ignored Plaintiff and maintained that they were upholding her November 3, 2023 resignation, and she was no longer employed with Defendants because she did not rescind her letter ***in writing*** prior to November 3, 2023.

51. Plaintiff had never been informed by Tocco during their aforementioned conversations leading up to her surgery (or by anyone else at Defendant) that she needed to rescind her letter or resignation in writing prior to her medical leave in order to retain her job.

52. Rather, as discussed *supra*, Tocco and Plaintiff had agreed that her resignation letter would apply ***only if*** her medical leave was not approved, and it had been as of November 14, 2023.

53. Most importantly, Plaintiff would never have submitted her resignation letter had Defendants properly engaged in the interactive process as required under the ADA, including but not limited to advising her that she could apply for an ADA-qualifying leave of absence (despite the fact that she was not eligible for FMLA at the time of her requests).

54. Based on the foregoing, it is averred that Defendants terminated Plaintiff on or about November 27, 2023, after (1) forcing her to submit a resignation letter due to their failure to properly engage in the interactive process and accommodate her disabilities; (2) assuring her that her resignation letter would be effectively rescinded if she had been approved for STD/medical leave; (3) approving her for STD/medical leave on November 14, 2023; (4) reversing the approval of her STD/medical leave on November 21, 2023; and (5) claiming that her resignation was never properly rescinded (despite never telling her that she had to rescind her resignation letter by any particular method) and thus involuntarily separating her employment with Defendants.

55.     Defendants claim that even if Plaintiff had rescinded her resignation in writing by November 3, 2023, they did not have to accept the rescinding her resignation (insinuating that Plaintiff's separation would be deemed a resignation even if she had rescinded it in writing).

56.     Therefore, to the extent that Plaintiff's separation is viewed as a resignation, it is clear as the foregoing facts show that Plaintiff was given no other option and was forced to submit her October 1, 2023 resignation letter as a direct result of Defendants' blatant violation of the ADA, including failing to engage in the interactive process and failing to accommodate Plaintiff.

57.     Upon information and belief, by the time that Plaintiff was released to return to work from her surgery/recovery, her prior position was still available. Therefore, there is no reason why Defendant could not have (1) accommodated Plaintiff's need for medical leave; and/or (2) allowed Plaintiff to rescind her October 1, 2023 resignation letter.

58.     Following her termination and recovery, Plaintiff applied for several jobs within Defendants, including her former position, that she was qualified for, but was not considered much less even interviewed for the same.

59.     Plaintiff believes and therefore avers that she was subjected to discrimination, retaliation, terminated, and not rehired/reinstated by Defendants because of: (1) her known and/or perceived health problems; (2) her record of impairment; (3) her requested accommodations (which constitutes illegal retaliation); and/or (4) Defendants' failure to properly accommodate her (discussed *supra*).

60.     Plaintiff believes and therefore avers that her disabilities were motivating and determinative factors in the termination of her employment by Defendants, and their failure to rehire/reinstate her following her medical leave.

## COUNT I
**Violations of the Americans with Disabilities Act, as Amended ("ADA")**
**(1) Actual/Perceived/Record of Disability Discrimination; [2] Retaliation;**
**[3] Failure to Accommodate; and [4] Failure to rehire/reinstate)**
**-Against Both Defendants-**

61. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

62. Plaintiff suffered from qualifying health conditions under the ADA which affected her ability (at times) to perform some daily life activities.

63. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendants, however, Plaintiff did require reasonable medical accommodations at times (*i.e.*, medical leave for surgery).

64. Plaintiff kept Defendants informed of her serious medical conditions and need for medical treatment and other accommodations.

65. Plaintiff requested reasonable accommodations from Defendants, including but not limited to a medical leave of absence for surgery and to care for and treat for her serious health conditions.

66. Plaintiff was terminated on or about November 27, 2023, in close temporal proximity to requesting/utilizing reasonable medical accommodations for her own health conditions and while still on medical leave.

67. Plaintiff believes and therefore avers that she was subjected to discrimination, retaliation, terminated and not rehired/reinstated because of: (1) her known and/or perceived health problems; (2) her record of impairment; (3) her requested accommodations (which constitutes illegal retaliation); and (4) Defendants' failure to properly accommodate Plaintiff, by failing to engage in the interactive process, terminating Plaintiff for requesting/utilizing reasonable medical

11

accommodations, and failing to keep Plaintiff's job open during her medical leave of absence.

68. Plaintiff also believes and therefore avers that her disabilities were motivating and determinative factors in the termination of her employment by Defendants and their failure to rehire/reinstate her following her medical leave.

69. Defendants' actions as aforesaid constitute violations of the ADA.

## COUNT II
### Violations of the Pennsylvania Human Relations Act ("PHRA")
(1] Actual/Perceived/Record of Disability Discrimination; [2] Retaliation;
[3] Failure to Accommodate; and [4] Failure to Rehire/Reinstate)
-Against Both Defendants-

70. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

71. Plaintiff properly exhausted her administrative remedies regarding her PHRA claims because she timely filed a charge of discrimination with the PHRC (by dual-filing her claims with the EEOC) and the charge has been pending for at least one year.

72. The aforesaid allegations also constitute violations of the PHRA. Thus, Plaintiff's PHRA claims mirror the claims as set forth in her previous claims.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B. Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement, and seniority.

C.  Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D.  Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper, and appropriate (including but not limited to damages for emotional distress/pain and suffering);

E.  Plaintiff is to be awarded the costs and expenses of this action and reasonable attorneys' fees as provided by applicable federal and state law; and

F.  Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
(215) 639-0801
*Attorneys for Plaintiff*
akarpf@karpf-law.com

Dated:  September 2, 2025